IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| STACEY RASMUSSEN, | ) | CASE NO: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **COMPLAINT** |
| | ) | |
| OMAHA WORLD HERALD COMPANY, | ) | |
| a foreign corporation, BH MEDIA GROUP, | ) | |
| INC., a foreign corporation,  and UNITED | ) | |
| OF OMAHA LIFE INSURANCE | ) | |
| COMPANY, a Nebraska insurance | ) | |
| company, | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW the Plaintiff, Stacey Rasmussen, and, for her causes of action against Omaha World Herald Company, BH Media Group, Inc. and United of Omaha Life Insurance Company, alleges and states as follows:

### PARTIES AND JURISDICTION

1.      Plaintiff, Stacey Rasmussen (hereinafter "Plaintiff" or "Rasmussen"), is an insured under a disability insurance policy provided for employees of Omaha World Herald Company.  Rasmussen is a resident of Sarpy County, Nebraska.  Rasmussen was employed by Omaha World Herald Company from August 13, 2012 to October 1, 2013.

2.      Defendant Omaha World Herald Company (hereinafter "Omaha World Herald") is a foreign corporation incorporated in the State of Delaware, and is authorized to do business in the State of Nebraska.

3.      Upon information and belief, BH Media Group, Inc. (hereinafter "BH Media Group") is the holding company of Defendant Omaha World Herald. Defendant BH Media Group is a foreign corporation incorporated in the State of Delaware, and is authorized to do business in the State of Nebraska.  Defendant Omaha World Herald maintains and operates short-term and long-term disability benefits programs under the BH Media Group Welfare Benefit Plan (hereinafter referred to as the "Plan").

4.     Defendant United of Omaha Life Insurance Company (hereinafter "Mutual of Omaha") is the claims administrator for Defendants Omaha World Herald and BH Media Group. Mutual of Omaha is an insurance company authorized to do business in the State of Nebraska.

5.     Mutual of Omaha provides claims management advice and administration to Defendants Omaha World Herald BH Media Group as relates to this Plan.

6.     Plaintiff brings this action against Defendants under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq., seeking to recover benefits due under the terms of Defendants' Plan. This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §1331 as this matter arises from the laws of the United States.

7.     Venue is proper in this district under 29 U.S.C. 1123, as Nebraska is the district where the Plaintiff's Plan was administered, the district where the breach took place, and the district where Defendants reside and/or are doing business within this judicial district.

## FACTUAL ALLEGATIONS

8.     From August 13, 2012 through October 1, 2013, Plaintiff was employed by Defendant Omaha World Herald as a District Supervisor in the Circulation Department.

9.     Plaintiff became disabled due to severe fibromyalgia resulting in chronic pain and severe chronic fatigue. On or about October 1, 2013, Plaintiff requested short-term disability and FMLA leave pursuant to the Plan. Defendants approved Plaintiff's short-term disability and FMLA.

10.     Upon the expiration of her short-term disability and FMLA, on or about November 22, 2013, Plaintiff filed a claim for long-term disability ("LTD benefits").

11.     Although Plaintiff's condition worsened, Plaintiff's claim for long-term disability benefits was denied on or about February 28, 2014, when Plaintiff received a letter from Mutual of Omaha indicating that there was insufficient evidence to support her restrictions or limitations to preclude Plaintiff from performing the Material Duties of her Regular Occupation under the Plan. A copy of Defendants' denial is attached hereto marked as Exhibit "A" and is incorporated herein by reference.

12.     Plaintiff promptly appealed this decision and provided additional documentation to support her request for long-term disability benefits. Dr. Kent Johnson drafted Plaintiff's appeal on her behalf due to Plaintiff's severe fibromyalgia and that "she is incapable of working

even in a sedentary position and certainly not at the type of job she was at before at [Defendant Omaha World Herald." Said appeal was filed on or about March 6, 2014. A copy of Plaintiff's Appeal is attached hereto marked as Exhibit "B" and is incorporated herein by reference.

13.     In investigating Plaintiff's appeal, Defendants required Plaintiff to attend an Independent Medical Examination (hereinafter "IME") with Dr. Jay Kenik on or about June 6, 2014. Dr. Kenik agreed with the opinions, diagnosis and treatment of Plaintiff's treating physicians, Dr. Kent Johnson and Dr. Marcus Snow. Dr. Kenik also agreed with Dr. Johnson's opinion of Plaintiff's restrictions and limitations. A copy of Dr. Kenik's IME report is attached hereto marked as Exhibit "C" and is incorporated herein by reference.

14.     After the corroborating IME of Plaintiff's severe restrictions related to her disability, Defendants requested an Occupational Analysis conducted by Vocational Consultant Ms. Patricia Thal on or about June 27, 2014. Ms. Thal did not interview Plaintiff or her treating physicians. Ms. Thal did not present to the Circulation Department to observe the job duties of Plaintiff's position. A copy of the Occupational Analysis report is attached hereto marked as Exhibit "D" and is incorporated herein by reference.

15.     On or about July 1, 2014, two (2) business days after the Occupational Analysis report was prepared, Mutual of Omaha again denied Plaintiff's claim for long-term disability benefits. In its denial, Mutual of Omaha relied upon the Occupational Analysis in denying Plaintiff's claim, in stating as follows: "there is no medical support for restrictions and limitations that would prevent [Plaintiff] from performing the material duties of your regular occupation."

16.     Plaintiff has exhausted the administrative remedies available to her and timely brings this action under ERISA and Defendants' Plan.

17.     Plaintiff qualifies for long-term disability benefits under the terms of Defendants' Plan, and Defendants have wrongfully denied Plaintiff benefits to which she is entitled since October 1, 2013.

18.     Plaintiff is totally disabled and precluded from performing work at her own occupation or any work at any reasonable occupation since October 1, 2013. As such, Plaintiff should receive long-term disability benefits from October 1, 2013 until such time as she reaches her 65th birthday, her death or the date upon which she is no longer totally disabled. Plaintiff is

also entitled to the health insurance and life insurance benefits that are additional coverages to long-term disability beneficiaries under Defendants' Plan.

**COUNT I**

**ACTION TO ENFORCE ERISA RIGHTS**

19.    Plaintiff restates and realleges Paragraphs 1-18 as if fully set forth herein.

20.    This action is an action to enforce Plaintiff's right to payment of long-term disability benefits pursuant to the Plan and as further described above.

21.    Defendant has refused to pay benefits pursuant to the Plan.

22.    Plaintiff is entitled to a payment of benefits under the Plan.

**WHEREFORE**, Plaintiff prays for judgment in favor of Plaintiff and against Defendants as follows:

A.  For declaratory judgment or order against the Defendant in determining the rights and responsibility of Defendants towards the Plaintiff pursuant to the Plan;

B.  For past due long-term disability benefits and other health and life insurance benefits under Defendants' Plan commencing October 1, 2013 until the date of trial;

C.  For future long-term disability benefits and other health and life insurance benefits under Defendants' Plan from the date of trial going forward;

D.  For costs and reasonable attorney's fees pursuant to 29 U.S.C. §1132 (g)(1);

E.  For pre-judgment and post-judgment interest; and

F.  For such other and further relief as the Court deems just and equitable.

DATED this 11th day of March, 2015.

STACEY RASMUSSEN, Plaintiff

By:    /s/ Raymond R. Aranza
Raymond R. Aranza  #18523
Jamie M. Hurst #25256
Marks Clare & Richards, L.L.C.
11605 Miracle Hills Dr., Ste. 300
Omaha, NE  68154
(402) 492-9800
raranza@mcrlawyers.com
jhurst@mcrlawyers.com
Attorneys for Plaintiff

N:\WDOX\CLIENTS\21788\000\PLEA\00146721.DOC

UNITED *of* OMAHA LIFE INSURANCE COMPANY
Mutual of Omaha Plaza
Omaha, NE 68175
402 342 7600
mutualofomaha.com


Mutual *of* Omaha

February 28, 2014

GLDQ-C140228215810000417



**STACEY L RASMUSSEN**
**12830 EMILINE ST**
**OMAHA NE 68138-3224**

**Policy # GUPR-05L86**
**Claim # 133400017801**

Dear Ms. Rasmussen,

We have completed our review of your application for Long Term Disability benefits under policy GUPR 5L86. Based on our review, we have determined that we are unable to approve benefits and your claim has been denied.

Your policy provides Long Term Disability benefits when an injury or sickness precludes you from performing one or more of the material duties of your occupation and your earnings are impacted according to the terms of the policy.

The provision(s) in your policy on which the denial of your claim is based, states the following:

"**Disability and Disabled** means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:

(a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

(b) unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

After a Monthly Benefit has been paid for 36 months, Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation.

Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with Your employer."

"**Material Duties** means the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than 40 hours per week in itself to be a part of material duties. One of the material duties of Your Regular Occupation is the ability to work for an employer on a full-time basis."

"**Regular Occupation** means the occupation You are routinely performing when Your Disability begins. Your regular occupation is not limited to the specific position You held

GLD_ANL_DENIAL_DIS_LTR

GLDQ-C140228215810000417010300000000000001  GLD_ANL_DENIAL_DIS_LTR


**EXHIBIT**
**A**

with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT). We have the right to substitute or replace the DOT with a service or other information that We determine of comparable purpose, with or without notice. To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region."

In order to make a claim determination, we review each claim to ensure that it meets all policy provisions and eligibility requirements. Once we have determined that all policy provisions and eligibility requirements have been met, we then review the medical documentation in the file to determine maximum work capacity if the documented restrictions and limitations are supported by medical evidence. The information we used to make our determination includes the following:

• Application for Long Term Disability benefits
• Long Term Disability policy GUPR 5L86
• Attending Physician's Statement, signed by Dr. Kent Johnson, Family Medicine, dated December 5, 2013
• Medical records from Dr. Kurt Boekenhauer, Chiropractor, for the period of December 15, 2010 through 11/06/2013
• Medical records from Dr. Johnson for the period of July 24, 2013 through October 26, 2013
• Medical records from Dr. Marcus Snow, Rheumatology for the period of September 17, 2013 through January 20, 2014
• Medical review completed by a Medical Consultant on February 13, 2014
• Medical Review completed by a Medical Consultant on February 24, 2014

Based on the information in your file, you stopped working as a District Supervisor on October 1, 2013. You are claiming disability for fibromyalgia.

The Attending Physician's Statement, signed by Dr. Johnson, dated December 5, 2013 indicates your primary impairing condition is fibromyalgia and you have no secondary conditions. The form indicates you are able to sit 4 hours and stand and walk 1 hour each in an 8 hour day. It is noted you should not work overnight shifts, lift greater than 15 pounds or perform activities requiring repetitive bending. Restrictions and limitations are indicated regarding driving/operating motorized equipment, lifting/carrying, bending, squatting, crawling, climbing and reaching above shoulder level.

You had an office visit with Dr. Johnson on July 24, 2013. A review of your medical history revealed chronic insomnia, chronic fatigue and possible fibromyalgia. You reported improvement with Savella and Elavil until the prior week. You advised you had muscle aches everywhere, were in severe pain and felt weak and fatigued. You were described as appearing tired and fatigued. The physical examination revealed pain to light touch in all muscles. Your blood pressure was 144/88. The impression included

fibromyalgia, chronic fatigue, sleep deprivation, insomnia and possible dehydration. Your Elavil was increased to 50mg daily. A comprehensive metabolic profile was normal. It was noted you may benefit from having regular work hours.

Dr. Snow saw you for an office visit on September 17, 2013. You stated you felt like your bones were breaking and had pain throughout your whole body. You reported increased fatigue and advised your job required you to work nights every other weekend and days the rest of the time. You denied muscle weakness, numbness and tingling. You reported exercising on a stationary bike. Your blood pressure was 130/80 and your weight was 209 pounds. You were described as being alert, oriented to person place and time and in no acute distress. The physical examination revealed pain to touch but no specific swelling. You had no joint tenderness and normal range of motion in your wrists, elbows, shoulders, hips and knees. Fibromyalgia tenderpoints were noted to your bilateral lateral epicondyle, trapezius muscles, low cervical region, second rib, supraspinatus, gluteal region, greater trochanter and medical facet pad of the knee. You were assessed with fibromyalgia and advised to exercise on a regular basis. Gabepentin was prescribed.

During your office visit with Dr. Johnson on October 16, 2013 you advised you were looking for new employment. You were described as being alert, oriented to person place and time and appearing in no acute distress. The physical examination revealed normal motor function, no focal deficits and normal deep tendon reflexes. Your blood pressure was 136-74 and your weight was 203 pounds.

On November 6, 2013 you had an office visit with Dr. Snow. The notes indicate your general health was unchanged. You rated your pain as 6/10 on a visual analog scale and you rated your fatigue as 8. You completed a modified health assessment questionnaire with a score of 0.375. You reported pain in your elbows, hips, knees, low back, neck, upper anterior chest and upper back. You stated you had numbness and tingling and you were not getting restorative sleep. You reported doing aerobic exercise frequently. You were described as being oriented to person, place and time and generally appearing to be in no acute distress.. The physical examination revealed tender points to the bilateral epicondyle, trapezius muscles, second rib, supraspinatus, gluteal region, greater trochanter and medial facet pad of the knee. The notes indicate you were doing better and your Gabepentin was increased to 200 mg 3 times daily. You were encouraged to exercise regularly and a follow up office visit was scheduled in 2 months.

An x-ray of your lumbar spine on January 20, 2014 revealed normal appearing lumbar joint spaces and disc spaces appearing generally appropriate. The impression was mild degenerative change of the lumbar spine and thoracic scoliosis.

An x-ray of your knees performed on January 20, 2014 revealed no abnormal findings.

Your file was reviewed by a Medical Consultant on February 13, 2014. The reviewer opined you have reported chronic generalized aches, insomnia and fatigue. Your physical examinations are positive for tender points as seen with fibromyalgia. Your laboratory results are normal. Your physical examinations note no motor strength loss, no gait



abnormality and no neurological deficits. You have denied muscle weakness and report performing aerobic activity frequently. You consistently appear in no acute distress and your vital signs are stable, which does not correlate with systemic pain. An overlay of depression and anxiety is present as you have been prescribed numerous psychotropic medications, however, there is no depression, anxiety, cognitive somnolence or psychological impairment noted on examinations. It appears you have self reported chronic generalized aches, insomnia and fatigue. There are no identifiable deficits to support restrictions or limitations.

Based on the information in your file, the physical examinations reveal no deficits in strength, no gait disturbance and no neurological deficits. While you have reported chronic pain, and pain to palpation over trigger points associated with fibromyalgia, you are consistently noted to be in no acute distress in your medical records, and your vital signs are consistently stable. There is a lack of evidence in the medical records to support restriction or limitations.

In Summary, the documentation in the file does not support restrictions or limitations to preclude you from performing the Material Duties of your Regular Occupation. Therefore, no benefits are payable and your claim has been denied.

If you disagree with our determination, and wish to appeal this claim decision, you or your authorized representative should submit a written request to appeal within 180 days of the date you receive this notice of denial to the address listed below.

United of Omaha Life Insurance Company
Group Insurance Claims Management, 8th Floor
Appeals Department
Mutual of Omaha Plaza
Omaha, NE 68175

If you wish, you may submit your comments and views of the issues, in writing, and any additional documentation, records or other information in support of your appeal. You are encouraged to submit any additional medical records that may be available to support your appeal. Medical records may include, but are not limited to: treatment notes, test results, consultation records, therapy notes, etc.

If an internal rule or guideline was relied upon in making the determination, you have the right to receive, upon written request, a copy of such information free of charge.

Within 45 days after United of Omaha Life Insurance Company receives your request for an appeal, we will render a determination, unless we have determined that special circumstances require an extension of time for assessing evidence and processing the claim. In that event, we will render a decision within 90 days after receipt of your appeal request.

If an extension is necessary due to your failure to submit information necessary to decide the appeal, the notice of extension will describe the required information, and you will be afforded 45 days from the receipt of the notice to provide the specified information. If you deliver the requested information within the time specified, the 45 day extension of the review period will begin after you have provided that information. If you fail to deliver the requested information within the time specified, we will make our determination without that information. Our review will take into account all new information, whether or not presented or available at the initial determination. No deference will be afforded to the initial determination.

I take my obligation to review your claim seriously and have made this benefit determination based upon all of the information in your claim file and the provisions of the insurance contract. I have not had contact with company actuaries or financial personnel and have no information with regard to the effect of this claim handling on company financial results. You should also know that I did not receive, nor was I eligible to receive, any financial or other incentive or penalty based on the denial or approval of your claim.

If your plan is governed by the Employee Retirement Income Security Act (ERISA), you have the right to bring a civil action suit once all administrative rights to review have been exhausted. You and your plan may have other voluntary alternative dispute resolution options available, such as mediation. To find out what options may be available, you may contact the local U.S. Department of Labor Office and your state insurance regulatory agency.

If we do not receive your appeal within 180 days from the date you receive this letter, our claim determination will be final.

Nothing in this letter should be construed as a waiver of any rights or defenses under the above-captioned policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned.

In addition, your claim may be reviewed further by the Nebraska Department of Insurance, 941 "O" Street, Suite 400, Lincoln, NE 68508. Their telephone number is (402) 471-2201.



For your convenience, information can be sent to our office by one of the following methods:

Our fax number is: (402) 997-1865

Our email address is: submitgrpdisinfo@mutualofomaha.com

If you should have further questions regarding your claim, you may call our toll free number at: (800) 877-5176, extension 8161, or my direct line is 402-351-8161.

Sincerely,

*Stephanie Smith*

Stephanie Smith
Group Insurance Claims Management



**METHODIST** 🦋®
**PHYSICIANS** CLINIC

March 6, 2014

United of Omaha Life Insurance Company
Group Insurance Claims Management
Eighth Floor Appeals Department
Mutual of Omaha Plaza
Omaha, NE 68175

RE: **RASMUSSEN, STACEY L. - POLICY #GUPR-05L86 - CLAIM #133400017801**
   DOB: 08/31/1968
   MRN: 3432202
   12830 EMILINE ST
   Omaha, NE 68138

To Whom It May Concern:

This letter is an appeal letter for Stacey Rasmussen regarding her denial of disability. Stacey has significant fibromyalgia resulting in chronic pain and severe chronic fatigue. You have access to my previous records, and you have access to records from Dr. Snow, a rheumatologist who confers with the diagnosis. Stacey has failed to improve significantly with any medications. Originally, she was working overnights and having to lift heavy burdens. We took her off work because of that. I felt that she might be able to work more regular hours during the day and not have the sleep deprivation of a night job and the heavy lifting, but even with her absence of working overnight, she has failed to improve. Her pain level continues to be between a six and eight on a scale of ten. Her fatigue level continues to be at an eight.

She has been treated with Savella, gabapentin, amitriptyline, vitamin D supplementation, and anti-inflammatory medicines such as meloxicam with no benefit. The amitriptyline and Savella have not been for reasons of depression but for treatment of her fibromyalgia. She is able to exercise very slowly with no resistance on an exercise bike, but she is unable to really lift anything more than seven to ten pounds. Indeed, she was unable to carry a seven-pound box of kitty litter out of a grocery store because of pain and weakness. She is unable to sit for more than one out at a time. She may be able to sit a total of four hours through a 24-hour period, but she is not able to sit for four hours during an eight-hour workday, and she has to often lay down after sitting because of worsening pain in her back. She has had normal laboratory evaluation and x-ray evaluation, but that does not rule out the diagnosis of fibromyalgia. As you well know, there are no tests to confirm the diagnosis, and I think the fact that a licensed board-certified rheumatologist feels she suffers from fibromyalgia along with my own clinical opinions and her physical examination findings, would confirm that diagnosis.



EXHIBIT
B

RASMUSSEN, STACEY L.-3432202
**Page 2 of 2**

I do not feel at the moment that she is capable of working even in a sedentary position and certainly not at the type of job she was at before at the newspaper. I therefore ask that you reconsider your decision to deny her disability insurance.

Sincerely,

Kent Johnson, M.D.
Methodist Physicians Clinic - Millard
Department of Family Medicine
5908 South 142nd Street
Omaha, Nebraska 68137
(402) 354-1900
FAX (402) 354-1910

D:03/06/2014  17:05    T:03/07/2014  09:01
EHK/316069

| \*\*\* THIS IS AN ELECTRONICALLY VERIFIED REPORT \*\*\* |
|---|
| 3/10/2014 12:20 PM:  Kent D Johnson, MD |



**MLS National Medical Evaluation Services**
**MLS Peer Review Services**
**FMLA Medical Assessments**

*MLS Group of Companies, Inc.*

Phone: 888.657.4634  |  Fax: 248.356.6757  |  www.mls-ime.com



June 6, 2014

RE: Stacey Rasmussen
DOB: 08/31/68

As you know, Stacey Rasmussen was seen today 6/6/14 for the purpose of an Independent Medical Evaluation. Upon arriving to the appointment at 1:10pm she was identified by direct observation of her driver's license.

Prior to the evaluation I had the opportunity of reviewing the entire medication records forwarded to me including 1. Her job summary. 2. The long-term disability claim form and disability summary notes. 3. The medical records of Dr. Kent Johnson 4. Chiropractic records of Kurt Boeckenhauer, DC. 5. The medical records of Dr. Marcus Snow. In addition, an x-ray report dated 1/20/14 imaging the spine showing mild degenerative changes along with bilaterally normal knees were also reviewed.

This patient is a 45-year-old white female who started to develop symptoms characterized by arthralgias and myalgias associated with chronic fatigue and poor quality of sleep. Her symptoms were in a polyarticular distribution including the neck and shoulder girdle, hip, as well as, distal lower extremities. She states that her job as a district supervisor for the Omaha World Herald required a lot of repetitive activity involving the upper extremities as well as lifting of upwards of 50-lb. She states that during the end of the day she was exhausted and in significant discomfort without any recovery over the next 8 to 12 hours. Prior to doing this type of employment, while in California she worked as a massage therapist and feels she, too, had difficulty doing this kind of work which required carrying a table as well as a lot of resistive activity with her upper extremity.

Because of her ongoing symptoms she was seen by her primary care physician, Dr. Kent Johnson who evaluated her and diagnosed fibromyalgia. Therapy was initiated with Amitriptyline to help restore sleep along with Savella for the purpose of controlling some of her pain. He also encouraged aerobic exercise. She states that her medications did afford her some modest benefit, although her symptoms persisted. She was seen by her chiropractor on multiple occasions who treated her with manipulation, though no massage. These also afforded her



**EXHIBIT**

C

RE: Stacey Rasmussen
June 6, 2014
Page 2

some modest benefit. Because of the ongoing nature of her signs and
symptoms, she was seen an evaluated by Dr. Marcus Snow. He confirmed the
diagnosis and added Gabapentin along with the recommendations for stretching.

In spite of her current therapy, ongoing symptoms remain evident including poor
quality of sleep, chronic fatigue, myalgias and arthralgias, occasional headaches,
some asymmetric numbness and tingling, as well as, hyperalgesia and allodynia.

The patient attempts to exercise on a daily basis using a recumbent bike, which
she can stay on for up to 20 minutes at a time. She is currently not productive.

Past Medical History:
Positive for asthma. History of scoliosis. C-sections times 2. Endometriosis.

Social History:
Tobacco (-). ETOH (-).

Allergies:
NKMA.

System Review:
HEENT: Headaches. No visual problems. Currently no tinnitus or hearing
deficits. No nosebleeds. No difficulty swallowing.
Pulmonary: No cough, SOB, DOE, or PND. No hemoptysis or pleuritic chest
pain.
Cardiac: No chest pain or palpitations.
GI: No dyspepsia. No hematemesis or melena. Negative for GERD symptoms.
GU: No hematuria, polyuria, or dysuria. No frequency.
Neurological: No focal weakness. Numbness and tingling. No seizures.
Chronic fatigue.

Physical Examination:
Her weight was 206-lb. BP: 120/82. Respiratory rate was 16. HEENT: Patient
appeared normocephalic. PERL. Sclerae conjunctivae were clear.
ENT- no significant abnormality. Mouth was clear. Teeth were in good repair.
Neck- no lymphadenopathy or thyromegaly. Chest was clear to auscultation.
Heart had a RRR without murmurs or gallops. Abdomen – there was no palpable
organomegaly or tenderness. Neurologically, there were no focal deficits. DTR's
were symmetric and normoactive. Strength was 5/5 peripherally. Examination of
the extremities revealed no rashes. There were no active joints peripherally.
Soft tissue tender points numbered 18 of 18 of the classic fibromyalgia tender
point grid. Range of motion of all of her joints were within normal limits.

RE: Stacey Rasmussen
June 6, 2014
Page 3

Of note, during the examination she did have to transfer and stand two separate occasions because of discomfort, however, during my tender point exam, there was not a significant increase in pulse on eliciting pain.

**Assessment:**
Fibromyalgia.

1. In reference to your specific questions, her diagnosis of fibromyalgia is supported by the history and the physical findings on the tender point exam of 18 of 18 tender points in the classic locations. This impression is in agreement with her caring physicians and Dr. Snow.

2. In reference to this diagnosis, reasonable restrictions would be to avoid repetitive activities especially with the arms extended out in front of her. In addition, repetitive lifting as well as protracted standing and sitting in one position without the opportunity to get up and move around or to sit down between intervals would be recommended against.

3. I have reviewed the restrictions and limitations as filled out by Dr. Johnson dated 12/5/13. I feel these are not unreasonable, however, I would increase her ability to stand and walk to two to three hours as there would be no increased risk for injury with these activities.

4. My causal observations of activities outside the evaluation process were consistent with similar activities that were part of the evaluation process.

5. I found that her findings were consistent with claimed restrictions and limitations and the exam findings were felt to be valid. There were no verbal statements or physical behaviors that were unusual or inconsistent with the claimed restrictions and limitations. Other than the lack of a pulse increase with painful maneuvers there were again no inconsistent findings or signs of malingering.

6. The treatment of the diagnoses under the direction of Dr. Johnson and Dr. Snow, I feel, is certainly appropriate.

7. Rather than enumerating all the fibromyalgia tender points, 18 of 18 tender points with less discomfort elicited from the control points were recognized as outlined by the American College of Rheumatology for classification of this condition.

RE: Stacey Rasmussen
June 6, 2014
Page 4

It should be noted that there was no intrinsic physiologic muscle weakness or impaired range of motion as part of the exam.  In addition, the patient does report that her normal activities of daily living are predormitally for self care, although she does exercise as noted above on the recumbent bike with a little or no restriction for upwards of 20 to 25 minutes at a time.

Sincerely yours,

Jay G. Kenik, MD
Alegent Creighton Clinic
Division of Rheumatology

DD: 06/06/14 DT: 06/07/14 JGK/sdk

Outside IME or FCE completion list

Entry Date: 04/18/14
Vendor: MLS
Claimant Name: <u>Stacey Rasmussen</u>
Claim #: 133400017801

Specialty: Rheumatology IME
Analyst: Kevin Kendall
Referred by: Dr Reeder
Claim Type: LTD appeal
Policy #: GUPR 05L86
City, State: Omaha, NE
Call Log? yes
Attorney? no

| Recs provided by | x | Analyst | Straight to pdf |
| File sorted? | x | Yes | no |

**For post scan**

| | |
|---|---|
| x | IME - 21 |
| | FCE - 49 |
| | CD (observation) sent |

| Outgoing Checklist | |
|---|---|
| x | Create file referral sheet(s) |
| x | File size: 128 pages scanned |
| | Med recs to vendor |
| | secure E-mail   Fax   Web   UPS |
| | Lotus Notes - create folder |
| | Disability Database - update |
| | Note in FINEOS |
| | Tracking db - add new record |
| | IME/FCE: Email analyst |
| | IME/FCE: Add to appt reminder list |

### IME / FCE Appointment Tracking

Appointment Date/Time: 10/6 @ 1pm
2-day appt? Day 2 D/T

☐ Tracking db - enter appt date/distance
☐ Look up mileage info
☐ approx. 14 miles from claimant
☐ Send copy of the letter to the analyst
☐ Send copy of the letter to Efax

| Incoming Checklist | |
|---|---|
| | Tracking Database - update |
| | Forward pdf report to the analyst |
| | Forward report pdf to Efax |
| | Pdf emails and send to Group Disability |
| | Route this packet to Post Scan |

Reschedule 2 Date/Time: _____   Same venue?   Y / N
*Reason for reschedule:* _____

Reschedule 3 Date/Time: _____   Same venue?   Y / N
*Reason for reschedule* _____

Notes: _____

_____

_____

_____

_____

_____

RECEIVED
JUN 1 8

Completed by: Tess Rehn



**UNIVERSITY DISABILITY CONSORTIUM**
*Physician Specialists for Disability Evaluation and Management*

*Administrative Offices *76 Chestnut Street *Newton, MA 02465 *617-527-1855 * fax 617-275-8644 *e-mail UDC@Udcl.com*
June 27, 2014

## OCCUPATIONAL ANALYSIS

**Claimant:**          Stacey Rasmussen
**Claim Number:**      133400017801
**Analyst:**           Kevin Kendall

### DISCLAIMER

This is a vocational rehabilitation review. I have not personally met with Ms. Rasmussen. All records provided by the referrer were reviewed. My opinions are based on my education, training, and experience as a Rehabilitation Counselor and Vocational Expert and are within a reasonable degree of vocational certainty. My opinions are independent of any claims decisions or the referring agency. I have encountered no conflicts of interest in the performance of this review.

### FILE REVIEW/SUMMARY

The file was referred 06/26/14 for an Occupational Analysis. Ms. Rasmussen is a 45-year-old District Supervisor, who experienced an interruption of work 09/30/13 due to fibromyalgia.

In preparation for this report, I have reviewed Ms. Rasmussen's job description and consulted standard vocational resources, e.g. the Dictionary of Occupation Titles (DOT), the Occupational Outlook Handbook (OOH), and the Occupational Information Network (O*NET)/Standard Occupational Classification (SOC) coding system, as well as internet job boards, e.g. Indeed.com.

### JOB DESCRIPTION

Per the Job Description, Ms. Rasmussen's job title is that of District Supervisor. The job is summarized as:

> "Responsible for recruiting, showing and contracting independent contractors on designated routes in their district. Maintaining service levels & retaining subscribers. Where applicable meeting sales and collections goals. This position works closely with all departments in the Circulation Division to ensure accomplishment of sales, service and collections in assigned districts."

Physically the job requires the ability to lift up to 50 pounds occasionally, i.e. medium physical demand level.

1


EXHIBIT
D

## OCCUPATIONAL INFORMATION

Based on a review of the job information provided, Ms. Rasmussen's job tasks are most closely represented by the following description in the Dictionary of Occupational Titles (DOT): Supervisor, Route Sales-Delivery Drivers. The DOT describes this occupation as requiring a Light physical demand level, involving frequent reaching, handling, fingering, talking, hearing, and near acuity. The DOT notes that the Specific Vocational Preparation (SVP) level is 5, i.e. skilled occupation.

The DOT description and tasks are substantially similar to the updated information in the Standard Occupational Classification/Occupational Information Network (SOC/O*NET) description of First-Line Supervisors of Transportation and Material-Moving Machine and Vehicle Operators (53-1031.00). The O*NET describes this occupation, along with sample job titles and tasks as,

> "Directly supervise and coordinate activities of transportation and material-moving machine and vehicle operators and helpers.
>
> **Sample of reported job titles:** Dock Supervisor, Driver Manager, Fleet Manager, On Car Supervisor, Operations Supervisor, Street Supervisor, Supervisor, Trainmaster, Transportation Supervisor, Warehouse Supervisor
>
> - Enforce safety rules and regulations.
> - Plan work assignments and equipment allocations to meet transportation, operations or production goals.
> - Direct workers in transportation or related services, such as pumping, moving, storing, or loading or unloading of materials or people.
> - Review orders, production schedules, blueprints, or shipping or receiving notices to determine work sequences and material shipping dates, types, volumes, or destinations.
> - Inspect or test materials, stock, vehicles, equipment, or facilities to ensure that they are safe, free of defects, and consistent with specifications.
> - Confer with customers, supervisors, contractors, or other personnel to exchange information or to resolve problems.
> - Monitor field work to ensure proper performance and use of materials.
> - Dispatch personnel and vehicles in response to telephone or radio reports of emergencies.
> - Drive vehicles or operate machines or equipment to complete work assignments or to assist workers.
> - Plan and establish transportation routes."

O*NET conducted a survey of valid respondents in 2013. The following results were obtained.

- 65% reported <u>sitting</u> about half the time to continually. An additional 34% reported less than half the time.
- 58% reported <u>making repetitive motions</u> about half the time to continually. An additional 34% reported less than half the time.

- 56% reported <u>using their hands to handle, control, or feel objects, tools, or controls</u> less than half the time to never and 44% reported about half the time to continually.
- 59% reported <u>standing</u> less than half the time to never and 40% reported about half the time to continually.
- 69% reported <u>walking or running</u> less than half the time to never and 36% reported about half the time to continually.
- 75% reported <u>bending or twisting the body</u> less than half the time to never.
- 84% reported <u>kneeling/crouching/stooping/crawling</u> less than half the time to never.
- 65% reported never <u>keeping or regaining balance</u> and 24% reported less than half the time.
- 84% reported never <u>climbing ladders, scaffolds, or poles.</u>

No additional information was provided by OOH.

## PHYSICAL DEMANDS

Based on the above research, Ms. Rasmussen's occupation typically is performed at the light physical demand level.

The Department of Labor defines light work as,

> **"L-Light Work** - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible."

Physical demands include:

- <u>Frequent</u> sitting, reaching, fingering, and handling
- <u>Occasional</u> standing and walking
- <u>No to occasional</u> bending/twisting, kneeling/crouching/stooping/crawling and balancing
- <u>No</u> climbing

## SUMMARY

An Occupational Analysis was completed. Based on the above review and research, Ms. Rasmussen's occupation typically is performed at the light physical demand level. Physical demands are noted above.

3

Thank you for referring this file. Please do not hesitate to contact me should you have any questions.

Patricia Thal, MA, CDMS, ABDA
Vocational Consultant
(Rasmussen, S) w

4